J-A17009-20

2020 PA Super 285

| ACME MARKETS, INC. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| v. | : | |
| | : | |
| BEVERLIE R. SELTZER AND | : | |
| PENNSYLVANIA LOTTERY | : | |
| DEPARTMENT OF REVENUE, | : | |
| COMMONWEALTH OF PENNSYLVANIA | : | |
| | : | |
| | : | |
| APPEAL OF: BEVERLIE R. SELTZER | : | No. 3331 EDA 2019 |

Appeal from the Order Entered November 20, 2019
In the Court of Common Pleas of Bucks County
Civil Division at No(s): No. 2019-02791

BEFORE: BOWES, J., McCAFFERY, J., and FORD ELLIOTT, P.J.E.

OPINION BY BOWES, J.: **FILED DECEMBER 15, 2020**

Beverlie R. Seltzer ("Ms. Seltzer") appeals from the order granting summary judgment in favor of Acme Markets, Inc. ("Acme"), and denying her cross-motion for summary judgment in this conversion action. We affirm.

The following facts are not in dispute. Acme is a retailer licensed by the Pennsylvania Lottery ("the Lottery") to sell terminal-based tickets at its Doylestown, Pennsylvania store. In accordance with the license agreement, the Lottery placed a WAVE terminal in the Acme store through which lottery tickets are generated via connection to the Lottery's computer system. The terminal generates tickets for the next upcoming drawing, and automatically begins printing tickets for the next drawing as soon as one occurs. The Lottery keeps tally of each "play" issued through Acme's WAVE terminal and issues daily and weekly reports of the totals. Rather than pay the Lottery for each

ticket when it is generated, Acme maintains a back account from which the Lottery withdraws each Tuesday the total amount Acme owes for the prior week's transactions, less Acme's five-percent commission. Of importance to the case at bar, Acme must pay for all tickets that it prints from the WAVE terminal, less the commission, even if the ticket was printed by mistake and Acme was unable to sell it. Acme cannot return these "mistake tickets" to the Lottery, and thus it keeps these tickets near the WAVE terminal and attempts to sell them to other customers prior to the drawing. Each morning Acme's office coordinator scans any unsold mistake tickets to determine whether any are winners for which Acme may collect the prize money.[1] The remaining mistake tickets are discarded.

With this background information, we turn to the facts concerning ownership of the mistake ticket that is the subject of the instant litigation. The trial court summarized those facts as follows:

> At about 2:20 p.m. on March 21, 2019, a customer came into the Doylestown Acme and requested that the customer service representative print or sell five PA Match 6 tickets to him. The customer service representative used the lottery terminal to print one ticket with five sets of numbers on it. Each set of numbers costs a customer $2.00. After reviewing the ticket, the customer rejected it and asked the Acme clerk to print five separate tickets for him. [The rejected ticket was added to a pile of mistake tickets.] . . .
>
> Later in the day, [Ms.] Seltzer, a longtime Acme employee, came in for her shift at the customer service desk. The Match 6

---

[1] Ms. Seltzer admits that Acme is entitled to redeem mistake tickets. **See** Ms. Seltzer's Answer to Acme's Motion for Summary Judgment, 10/15/19, at ¶ 30.

drawing occurred at 7:00 p.m. Shortly **after** the drawing, at about 8:04 p.m., [Ms.] Seltzer began scanning the pile of mistake tickets[, a practice she had engaged in in the past, when she had discarded losing tickets and left winning tickets for the office coordinator to process the next morning[2]]. As she scanned through them, she discovered that one of the mistake tickets was a winning ticket, in the amount of $4,150,000.00. At this point, after learning the ticket was a winner, [instead of leaving the ticket for the coordinator to process the next day,] [Ms.] Seltzer took $10.00 in cash out of her purse, rang up her own transaction, and put the $10.00 in the register in an attempt to purchase the ticket. She was still on the clock at the time.

[Ms.] Seltzer never consulted with anyone at Acme before attempting to purchase the mistake ticket. [Ms.] Seltzer proceeded to tell other employees, including a supervisor, that she had won the lottery, though claiming that she could not remember the time when she purchased the ticket. No one at Acme authorized or approved [Ms.] Seltzer's taking possession of the ticket. She did not tell anyone at Acme the value [of] the ticket or the situation surrounding her "purchase" of the ticket. At some point thereafter Seltzer signed the back of the winning ticket and proceeded to contact the . . . Lottery about claiming her winnings. It is not the . . . Lottery's practice to investigate the bearer of winning tickets. Acme received a $10,000 bonus check as a result of selling the winning ticket. It would have received this bonus whether it had sold the ticket to a customer or retained the ticket for itself.

Upon reviewing the security tapes, Acme discovered that [Ms.] Seltzer had attempted to purchase the ticket **after** the Match 6 drawing and **after** she had known it was a winner. Upon confronting [Ms.] Seltzer as to this revelation, [she] stated that it was her ticket and proceeded to contact the . . . Lottery about claiming the reward.

On April 16, 2019[,] Acme filed a complaint in order to determine the proper owner of the lottery ticket.[] At that point, after a hearing, [the trial court] ordered that the lottery winnings be placed in escrow pending the resolution of this case. The

---

[2] **See** Acme's Motion for Summary Judgment, 9/16/19, at ¶ 130 (citing video footage from January and February 2019).

parties agreed that once the Lottery paid the proceeds into the escrow account, the Lottery would be removed as a party to this case.

Trial Court Opinion (Corrected), 1/24/20, at 1-3 (unnecessary quotation marks and capitalization omitted, emphases in original).

Acme and Ms. Seltzer filed cross-motions for summary judgment. Acme asserted that resolution of the dispute[3] hinged upon the answers to the following questions: (a) whether Acme had a property interest in the mistake ticket at the time Ms. Seltzer scanned it , and (b) whether Ms. Seltzer, acting in her capacity as an Acme employee, engaged in an unauthorized sale of the ticket to herself in her individual capacity. *See* Acme's Motion for Summary Judgment, 916/19, at 33.

Acme posited that it had a valid property interest in the mistake ticket because the moment it was delivered to Acme via the WAVE terminal, Acme became obligated to pay the Lottery for that ticket regardless of whether it sold it to a third party. *Id*. at 33. As for the second question, Acme contended that two independent bases rendered the sale of the ticket unauthorized, namely: (1) because Ms. Seltzer, who was acting as the agent of Acme when she sold the ticket to herself, did not disclose all pertinent facts to Acme and obtain its informed consent as is required by the principles of agency law; and

---

[3] Acme stated counts of declaratory relief and conversion. *See* Amended Complaint, 5/28/19, at 13.

(2) Acme is not authorized to sell a lottery ticket to a customer after ascertaining whether it is a winning ticket. *Id*. at 33-34.

Ms. Seltzer, on the other hand, maintained that Acme had failed to adduce sufficient evidence to establish that it had a property right in the ticket. She asserted that provisions of the Pennsylvania Lottery Code establish that a ticket is a bearer instrument deemed to be owned by its possessor, and that the ticket itself is the only valid receipt for claiming a prize. *See* Ms. Seltzer's Motion for Summary Judgment, 9/16/19, at 14 (citing, *inter alia*, 61 Pa. Code § 875.9(a)). She further argued that Acme's interest in mistake tickets is that of a licensee of the Lottery until Acme delivers funds for the unsold tickets as part of its weekly reconciliation each Tuesday. Thus, Ms. Seltzer asserts, since she paid Acme for the ticket before Acme made its weekly reconciliation payment to the Lottery for that ticket, she acquired superior title. *Id*. at 15-17.

After reading the parties' filings and entertaining oral argument, the trial court took the matter under advisement. On November 20, 2019,[4] the court entered an order granting Acme's motion for summary judgment, denying Ms. Seltzer's cross-motion, declaring Acme to be the rightful owner of the mistake ticket, entering judgment in favor of Acme, and directing the escrow agent to pay the full amount of the escrow fund to Acme. *See* Order, 11/20/19.

---

[4] The order is dated November 15, 2019, but was not filed until November 20, 2019.

- 5 -

Seltzer filed a notice of appeal the following day, and both Seltzer and the trial court complied with Pa.R.A.P. 1925.

Ms. Seltzer presents the following questions for this Court's consideration:

> 1.  Did the trial court err in applying the Uniform Commercial Code, not the State Lottery Law and its regulations, to decide ownership of the lottery ticket at issue in this case, when the Commercial Code does not apply to lottery tickets and the State Lottery Law is a specific and complete statute and its regulations offer two different bases to decide ownership of the lottery ticket?
>
> 2.  Did the trial court determine the impact of Acme's relationship as agent, licensee, and fiduciary of the Pennsylvania Lottery—according to statute and contract—on the question of ownership?
>
> 3.  Did the trial court err in in [*sic*] concluding that Acme had a superior right to the ticket, even though there is no authority prohibiting [Ms.[5]]. Seltzer from paying for an unsold mistake ticket left on the counter of the lottery terminal after a drawing and Acme kept her money?
>
> 4.  Did the trial court err in granting Acme's motion [for] summary judgment when there are genuine disputes of material fact as to the remaining elements of conversion—consent and justification—and [Ms.] Seltzer's estoppel defense?

Ms. Seltzer's brief at 6-7.

We begin with our standard of review.

> An appellate court may reverse a grant of summary judgment if there has been an error of law or an abuse of discretion. Summary judgment is appropriate only in those cases where the record clearly demonstrates that there is no genuine issue of material

---

[5] "Ms." and Mrs." are used interchangeably in Ms. Seltzer's brief. We have opted to use "Ms." uniformly for the sake of consistency.

fact and that the moving party is entitled to judgment as a matter of law. The trial court must take all facts of record and reasonable inferences therefrom in a light most favorable to the non-moving party. In so doing, the trial court must resolve all doubts as to the existence of a genuine issue of material fact against the moving party, and, thus, may only grant summary judgment where the right to such judgment is clear and free from all doubt. Because the issue here, namely whether there are genuine issues of material fact, is a question of law, our standard of review is *de novo* and our scope of review is plenary.

*In re Risperdal Litig.*, 223 A.3d 633, 639 (Pa. 2019) (cleaned up).

The trial court held that the undisputed facts established Acme's right to judgment as a matter of law on its conversion claim. Conversion is "the deprivation of another's right of property in, or use or possession of, a chattel, or other interference therewith, without the owner's consent and without lawful justification." *Spector Gadon & Rosen, P.C. v. Rudinski, Orso & Lynch*, 231 A.3d 923, 925 (Pa.Super. 2020) (internal quotation marks omitted). Hence, to affirm the trial court's judgment, we must conclude that the certified record is clear and free from doubt that Acme was the owner of the mistake ticket at the time Ms. Seltzer took possession of it, and that Ms. Seltzer took possession without justification or Acme's consent.

Ms. Seltzer's first two questions challenge Acme's ownership of the ticket. Specifically, Ms. Seltzer argues that Pennsylvania's Lottery Code provides the only valid basis for determining the ownership of a ticket printed from a terminal by mistake, and that the trial court erred by looking to bases

outside the Code to adjudicate the issue. The parties agree that this case presents issues of first impression in Pennsylvania law.[6]

The trial court accepted Acme's argument that it became the owner of each ticket printed from the WAVE terminal at the moment of printing, and

_____

[6] We have not found another case in any jurisdiction in which a court resolved an ownership dispute between a retailer who was unable to sell a mistake ticket before a lottery drawing, and an employee who purchased it after learning that it was a winner. Indeed, we are aware of only one other instance in which this fact pattern arose. In ***Parsons v. Dacy***, 502 N.W.2d 108 (S.D. 1993), Robin Parsons printed a ticket while working for Mr. G's convenience store for a customer who refused to pay for it. She left it on the terminal for another employee to sell, but it was not sold before the drawing. The following morning, another Mr. G's employee, Ionia Klein noticed the ticket. She determined that it had hit for over $12 million, signed the ticket, and presented it to the South Dakota Lottery Commission, which declared Klein to be the winner. The Dacys, owners of Mr. G's, litigated against Klein. Parsons sued both the Dacys and Klein, contending that she had acquired a property interest in the ticket when the customer declined to buy it because it was Mr. G's policy to make the employee who printed the mistake ticket bear the loss. The ***Parsons*** Court affirmed the trial court's ruling that Parsons failed to produce evidence that Mr. G's had any such policy. ***See Parsons***, ***supra*** at 111. The Court noted in that decision that the litigation between Klein and the Dacys had settled prior to an adjudication of their competing claims of ownership of the mistake ticket.

Ms. Seltzer cites and relies upon ***Parsons*** as supportive of her position in the instant case. ***See*** Ms. Seltzer's brief at 55-56 (suggesting that the ***Parsons*** Court affirmed the entry of judgment in favor of an employee who purchased a mistake ticket after learning it was a winner). ***See also*** Ms. Seltzer's Motion for Summary Judgment, 9/16/19, at 14 (same). However, as the above summary makes clear, ***Parsons*** did **not** decide that an employee may acquire superior title to the winning mistake ticket by purchasing it after the drawing and after learning that it was a winner. As such, although the basic facts of that case are similar to those of the case *sub judice*, the legal issue before us was not adjudicated in ***Parsons***, and the decision in no way supports Ms. Seltzer's claim of ownership or otherwise aids in our resolution of this appeal.

that Acme retained ownership of each such mistake ticket that it failed to re-sell to a customer prior to the drawing. *See* Trial Court Opinion (Corrected), 1/24/20, at 4. Acme's position is premised on its contract with the Lottery and the Pennsylvania Code provisions governing the Lottery ("Lottery Code").

The contract terms contained in Acme's application for a lottery retailer license provide that all tickets received by Acme from the Lottery "are deemed to have been purchased by" Acme. *See* Acme's Memorandum of Law, 10/16/19, at Exhibit 1 (¶ 5 of unnumbered page 4). As noted above, tickets printed from a WAVE terminal may not be returned or refunded under any circumstances. *See* 61 Pa. Code § 875.8(b) ("A terminal-based lottery game ticket may not be canceled or voided once printed by the Lottery terminal, even if the terminal-based lottery game ticket is printed in error."). Instead, the moment the Lottery delivers a ticket to Acme through the WAVE terminal, Acme incurs immediate financial liability for the retail price of the ticket, less its five-percent commission. *See* Deposition of James W. Sawyer, Jr.,[7] 8/15/19, at 76-77. Rather than satisfy its payment obligation separately for each transaction, the individual sales are accumulated by the Lottery for a week at a time and withdrawn from Acme's bank account each Tuesday. *Id*. at 77.

---

[7] Mr. Sawyer is the individual who signed the verification for the Lottery's answer to Acme's complaint as its acting director of security. *See* Answer, 5/6/19, at 10 (pagination supplied).

- 9 -

Based upon these regulations and contract provisions, Acme asserted, and the trial court agreed, that Acme became the owner of the mistake ticket as soon as it was printed. Ms. Seltzer maintains that this holding is erroneous. Specifically, she contends that the Lottery Code both supplies the sole authority for proving ownership of a lottery ticket and establishes that licensee retailers cannot take title to any lottery tickets until the aforementioned weekly settlement date.

Ms. Seltzer relies upon 61 Pa. Code §§ 875.8(a) and 875.9(a) as the sole authority governing ownership of a lottery ticket under Pennsylvania law. The former provides, *inter alia*: "[t]he terminal-based lottery game ticket shall be the only valid proof of the bet placed, and the only valid receipt for claiming a prize." 61 Pa. Code § 875.8. Section 875.9 concomitantly provides as follows:

> A terminal-based lottery game ticket is a bearer document deemed to be owned by the person holding the terminal-based lottery game ticket, except that if a name is contained on the back of the terminal-based lottery game ticket, the person so named will, for all purposes, be considered the owner of the terminal-based lottery game ticket.

61 Pa. Code § 875.9(a).

When this litigation commenced, Acme was neither the bearer of the ticket nor had it placed its name on the back of the ticket. Rather, it is undisputed that Ms. Seltzer rang up the ticket purchase, placed $10.00 of her own money in the cash register, took possession of the ticket, signed the back of it, and submitted it to the Lottery for redemption. Consequently, Ms.

Seltzer claims the clear language of the Lottery Code declares that she, not Acme, was the owner of the ticket as a matter of law. *See* Ms. Seltzer's brief at 42-43.

Ms. Seltzer notes that Acme's contract with the Lottery provides that Acme "acts in a fiduciary capacity for the Department of Revenue **until** [**proceeds of sales of lottery tickets**] **are received by the Department as required**." Ms. Seltzer's brief at 48 (cleaned up; emphasis in source cited) (citing Acme's Exhibit 2 (Agreement of Sales of Pennsylvania Lottery Tickets)). The funds for the mistake ticket were not received by the Department "until the following Tuesday, five days after Ms. Seltzer rang up her lottery purchase, placed $10.00 in the register, and took possession of the ticket." *Id*. Ms. Seltzer also points to 61 Pa. Code § 809.11, which states that "[t]ickets that are not accounted for by the agent on the settlement date, regardless of the reason, shall be deemed sold to the agent." Based upon these provisions, Ms. Seltzer concludes, "Acme continued to act in a fiduciary capacity for the Lottery and had no independent right of possession in the mistake ticket unless and until the ticket remained unaccounted for by Acme on the settlement date the following Tuesday." Ms. Seltzer's brief at 48-49.

Ms. Seltzer complains that Acme's position that it owns a ticket once it is printed by the WAVE terminal "simply does not make sense in the Lottery's statutory and regulatory scheme." *Id*. at 50. She notes that Acme makes no account of when mistake tickets are generated, and the Lottery has no record

of when mistake tickets are sold to customers. *Id*. at 50-51. Ms. Seltzer's argument continues:

> There is a time discrepancy between ticket generation and ticket sale that does not exist for lottery sales in which a customer immediately takes possession of a ticket. Acme employees are encouraged to sell mistake tickets—which necessarily occurs later than the customer request which led to the generation of the mistake ticket. Here, Acme runs headfirst into one of the regulations upon which it chooses to rely: that all ticket sales shall be final and no ticket returns shall be accepted by any agent. If the Lottery makes a sale to Acme, then that sale too is final. In other words, if Acme is truly sold a lottery ticket, then it cannot resell mistake tickets at all. Accordingly, Acme's argument does not comport with the regulations or widespread lottery practice. The only conclusion is that Acme does not, and cannot, own mistake tickets as soon as they are generated.
>
> Taken to its logical conclusion, Acme could print tickets and refuse to sell them, expecting the tickets to revert to Acme without any exchange of money. Indeed, Acme seems to believe that it does not need to sell tickets at all: in its motion for summary judgment, it asserted as undisputed that the Lottery relinquishes control of the ticket to Acme, to be kept and claimed by Acme or resold to its customers. Under Acme's position, there is no need for a game of chance—a retailer can keep and claim all tickets for itself. Indeed, it would be in Acme's interest to keep and claim tickets anytime the prize for a lottery game is so great that it has positive expected value. Such a position would call the Pennsylvania Lottery into question.

*Id*. at 50-52 (cleaned up).

Hence, Ms. Seltzer argues that because she purchased the mistake ticket before Acme delivered funds for it to the Department of Revenue, and she had possession of the ticket, which bore her name on the back, the Lottery Code mandates that she be recognized as the owner of the ticket.

We find Ms. Seltzer's legal arguments to be devoid of merit. We first reject her nonsensical musings that adopting Acme's position would destroy the integrity of the Pennsylvania Lottery. The delay between the generation of tickets and reconciling those transactions with the Department does not afford a retailer an opportunity to pay only for winning tickets. Nor does it provide any better chance of purchasing a winner than a customer who pays for her chances up front. Acme and all retailers are eventually responsible for paying for each ticket they print, whether it is a winner or a loser. The odds of actually winning, and the financial repercussions of printing a ticket that does not win, are exactly the same no matter when the ticket price is paid to the Lottery.

Boiled down to its essence, Ms. Seltzer's claim hinges upon the acceptance of two principles: (1) that the Lottery Code's deeming of the bearer of a ticket to be its owner establishes ownership not only in the eyes of the Lottery, but for all purposes; and (2) that Acme acquires no ownership interest in any ticket unless it remains in possession of the ticket until the Lottery withdraws the funds for it the following Tuesday. We reject both.

Ms. Seltzer bases her claim that the Lottery Code is the sole arbiter of all aspects of lottery tickets upon 72 P.S. § 3761-310. That statute states: "No other law providing any penalty or disability for the sale of lottery tickets or shares or any acts done in connection with a lottery shall apply to the sale of tickets or shares or acts performed pursuant to this chapter." 72 P.S.

§ 3761-310. This statute does not, as Ms. Seltzer suggests, indicate that other law cannot be applied to adjudicating disputes over the ownership of a ticket or entitlement to proceeds from its winnings. Rather, this statute clearly means that the Commonwealth's anti-gaming laws do not apply to the state-run lottery. Indeed, ownership of lottery tickets or proceeds have long been adjudicated pursuant to generally-applicable laws. *See*, *e.g.*, *Nuhfer v. Nuhfer*, 599 A.2d 1348, 1349 (Pa.Super. 1991) (holding husband had an ownership interest in a ticket possessed by a co-worker and affirming that the proceeds were marital property subject to equitable distribution).

Further, the Lottery deems the bearer of a ticket to be its owner to make it clear to whom the Lottery will pay winnings. There is no indication that the provision exists for any purpose other than keeping the Lottery out of the business of adjudicating ownership disputes, or that any other person or entity is obligated by the Lottery Code to deem the holder of the ticket to be the rightful owner of the prize money. While 61 Pa. Code § 875.9(a) arguably prevents a court from directing the Lottery to pay winnings to someone other than the bearer of the ticket, it does not deprive a court of the authority to determine who is entitled to those funds once they leave the Lottery's possession. *Accord Estate of Benyo v. Breidenbach*, 233 A.3d 774, 781 (Pa. 2020) (holding that statute providing that municipal employee pension funds were payable only to the designated beneficiary and were not subject to garnishment or other legal processes applies "only to pension funds that

remain in the possession of the plan administrator," and does not prevent a court from directing the disposition of the funds after they leave the possession of the pension administrator).

Therefore, we hold that the Lottery Code provision viewing the bearer of a terminal-based ticket as the owner does not defeat Acme's ownership claim. Nor do we find the fact that Acme did not deliver the funds for the ticket to the Lottery before Ms. Seltzer took possession of the mistake ticket to be determinative of the ownership issue.

Ms. Seltzer's opposition to Acme's claim of ownership in its motion for summary judgment was largely based upon the fact that she paid for and took possession of the ticket before Acme's weekly settlement with the Lottery, and the Code provides that tickets that are unaccounted for at the settlement date "shall be deemed sold to the agent." 61 Pa. Code § 809.11. *See* Ms. Seltzer's Answer to Acme's Motion for Summary Judgment, 10/15/19, at ¶¶ 212, 234, 238. She contends that this means that Acme does not acquire an ownership in mistake tickets until the settlement date.

Acme responds that this section of the Code does not control, as it predates the existence of terminal-based games, and was enacted to govern scratch-off tickets, which, unlike WAVE-generated tickets, may be returned to the Lottery under certain circumstances. *See* Acme's brief at 45-50. We agree.

Chapter 809 was adopted in 1972 to govern the "consignment" of tickets to "agents" from banks. It indicates that "banks shall allocate lottery tickets to agents and shall collect tickets which the agents have not sold." 61 Pa.Code § 809.21. These unsold tickets in certain circumstances may be "returned to the bank from which they were obtained." *Id*. at § 807.3. Unless the tickets are properly returned within the time specified, "[a]ll tickets accepted by an agent from the State lottery or its authorized representatives shall be deemed to have been purchased by the agent[.]" *Id*. Further, "[t]he agent shall be responsible for lost or missing tickets or loose tickets not returned in sequential order." *Id*. This last provision is cross-referenced in the section relied upon by Ms. Seltzer, which provides in full: "Tickets that are not accounted for by the agent on the settlement date, regardless of the reason, shall be deemed sold to the agent. Reference should be made to § 807.3 (relating to agents responsible for tickets)." *Id*. at § 809.11.

It is undisputed that tickets printed from a WAVE terminal, such as the one at issue in this appeal, are sold by "retailers," 61 Pa. Code § 875.6, and may not be returned under any circumstances. *See* 61 Pa. Code § 875.8(b) ("A terminal-based lottery game ticket may not be canceled or voided once printed by the Lottery terminal, even if the terminal-based lottery game ticket is printed in error."). As discussed at length above, as soon as Acme prints a ticket through the WAVE terminal, it is obligated to pay the Lottery the retail price of the ticket, less its five-percent commission, regardless of whether it

ultimately sells the ticket to a customer or otherwise accounts for it . **See** Deposition of James W. Sawyer, Jr., 8/15/19, at 76-77.

Contrary to Ms. Seltzer's arguments, the mere fact that the Lottery did not ask Acme to fulfill its obligation to pay for the mistake ticket before the weekly reconciliation date established by the contract does not indicate that Acme did not own the ticket until the following Tuesday. Pursuant to its license agreement, the Lottery looks solely to Acme to pay for each ticket that it prints, and Acme fully bears the loss of non-payment by the customer who requested it. Accordingly, Acme does not act as a mere conduit through which the Lottery sells tickets to third-party customers, but, rather, Acme purchases the tickets from the Lottery. **See Williams & Co. v. Sch. Dist. of Pittsburgh**, 244 A.2d 37, 39 (Pa. 1968) (holding company purchased products from supplier and resold them to the ultimate consumer, rather than having been a mere conduit of a sale from the supplier to the consumer, where the supplier looked only to the company for nonpayment, and the company bore the risk of nonpayment by the consumer). Therefore, we agree with the trial court's holding that Acme "owns the ticket as soon as it is printed, unless and until it is resold to a customer." Trial Court Opinion (Corrected), 1/24/20, at 4.

In her next issue, Ms. Seltzer argues that even if Acme did have an ownership interest in the ticket, she nonetheless acquired a superior interest. She argues that Acme "lost" the mistake ticket through its "refusal to

safeguard the ticket after it was rejected by the customer." Ms. Seltzer's brief at 52-53. She suggests that Acme was negligent or reckless in its possession of the ticket because it made no accounting for mistake tickets and did not lock them away in a safe or a drawer. *Id*.

It is undisputed that mistake tickets, including the one at issue herein, are kept on the WAVE terminal behind the customer service desk in the customer service area of the store. *See* Ms. Seltzer's Answer to Acme's Motion for Summary Judgment, 10/15/19, at ¶ 66. Ms. Seltzer might have a plausible argument if it were a customer who "found" the ticket there and believed it to be lost. Plainly, that is not the case. As Acme aptly notes, Ms. Seltzer was acting within the scope of her employment when she "found" the ticket:

> [Ms.] Seltzer did not find the Match 6 lottery ticket on the street; she "found" the ticket under the WAVE terminal monitor, the exact location where she and other Acme associates kept mistake tickets. Thus, even if it can be argued that Acme "lost" the ticket on its own countertop—which in itself seems implausible—[Ms.] Seltzer "found" the ticket not in her personal capacity, but as Acme's agent. Moreover, under [Ms.] Seltzer's logic, every piece of merchandise behind the walled portion of the Acme customer service desk—cigarettes, etc.—may be "found" and claimed by any Acme associate.

Acme's brief at 56 (citations omitted).

Moreover, even if Acme more diligently protected the mistake tickets by requiring its employees like Ms. Seltzer to lock them away, those employees would have had the same access to them as they did when they were on the WAVE terminal. We are utterly unpersuaded by Ms. Seltzer's contention that

Acme lost the ticket by failing to take greater steps to prevent her from "finding" it.

Ms. Seltzer also argues that the mistake ticket was the abandoned property of the customer who declined to pay for it after it was printed at his request, and that she acquired title to it when she took it off of the terminal later that evening. *See* Ms. Seltzer's brief at 54-55. As we have concluded that Acme purchased the ticket from the Lottery when it was printed, and the customer rejected Acme's offer to sell it to him, the customer never owned the property, and therefore lacked the ability to abandon it.

Consequently, we agree with the trial court that Acme established as a matter of law the first element of its conversion claim—that Acme was the owner of the mistake ticket at the time Ms. Seltzer took possession of it. Ms. Seltzer's final argument on appeal attacks the remaining elements of conversion, claiming that there were issues of fact whether she took possession without justification or Acme's consent. *See* Ms. Seltzer's brief at 56-59. Ms. Seltzer waived this issue.

At a pretrial conference, counsel for both parties represented to the trial court that they believed the litigation would be resolved by the court's ruling on the motions, as there were no factual disputes. *See* N.T. Argument, 11/12/19, at 2. After reviewing the motions, the trial court agreed and advised the parties to appear for argument rather than trial. *Id*. at 3. At argument, the court stated its understanding of the undisputed material facts

relevant to the legal question before it. When the court asked the parties if they had any additions or corrections, Ms. Seltzer mentioned Acme's lack of internal policies and procedures regarding handling of mistake tickets, suggesting that the court may have declined to reference them because they were disputed. *Id*. at 6-7. The court expressed its opinion that those facts were not relevant, but reiterated that "if either side thinks that there's a fact that is relevant that is disputed, then we have to have a trial." *Id*. at 7. Ms. Seltzer did not assert that a trial was necessary after all, or argue that the court's relevance analysis was incorrect. Therefore, the trial court proceeded with oral argument rather than trial "[w]ith those facts [previously stated] and the agreement of counsel[.]" *Id*. at 9.

The certified record thus reveals that Ms. Seltzer affirmatively represented to the court that no trial was necessary, failed to object to the court's indication that the additional facts were not relevant, and again declined to indicate that the matter should be decided by a trial rather than summary proceedings. Hence, we conclude that Ms. Seltzer has waived any claim that disputed issues of material fact precluded the entry of summary judgment in this case. *See also Harber Philadelphia Ctr. City Office Ltd. v. LPCI Ltd. P'ship*, 764 A.2d 1100, 1105 (Pa.Super. 2000) ("Because Harber failed to raise the grounds before the trial court that it seeks to advance here, we declare that Harber has waived its first challenge to the order granting summary judgment.").

In arguing against waiver, Ms. Seltzer asserts that her position was that her "estoppel defense" need not be reached because Acme did not own the ticket, and "if the [c]ourt decided that Acme did indeed own the property, then the trial court needed to proceed to a trial." Ms. Seltzer's reply brief at 32-33. She cites many instances in the record where she raised her defense prior to the pretrial conference and oral argument discussed *infra*. *Id*. at 32. However, she offers no citation for having presented her if-then position to the trial court after agreeing to proceed with summary judgment proceedings in lieu of a trial. Accordingly, her argument, raised for the first time on appeal, is waived. *See* Pa.R.A.P. 302(a) ("Issues not raised in the trial court are waived and cannot be raised for the first time on appeal.").

Even assuming, *arguendo*, that the issue were not waived, we would hold that her defense is unavailing. Ms. Seltzer claims that she was justified in believing that she was permitted to do what she did because (1) Acme employees are permitted to purchase mistake tickets; (2) other Acme employees participated in lottery ticket pools during their shifts; (3) at least one customer telephoned in requests for tickets and retrieved and paid for them after the drawing;[8] and (4) Acme has no procedure for handling mistake

---

[8] A customer who played the lottery daily would at times play his numbers by calling them in to the Acme customer service before the drawing and would pick up and pay for the tickets afterwards. He never conditioned payment upon winning. *See* Deposition of Ms. Seltzer, 7/11/19, at 148-49. Acme has put an end to this practice.

tickets after a drawing other than leaving them by the terminal for the office coordinator to process the next morning. *See* Ms. Seltzer's brief at 57-58. Since "Acme made no effort to disabuse its employees of these practices at the time Ms. Seltzer worked behind the customer service desk," Ms. Seltzer contends that there were factual issues as to whether Acme could prove that she took possession of the ticket without Acme's consent and without justification. *Id*. at 58.

Notably absent from the evidence of practices Acme tolerated is a single instance of Acme permitting an employee or anyone else to make a post-drawing purchase of a mistake ticket **after its post-drawing value had been ascertained**. As the trial court aptly observed, "it is simply absurd for [Ms.] Seltzer to essentially argue that Acme would have willingly sold a ticket worth $4,150,000 for $10[.]" Trial Court Opinion (Corrected), 1/24/20, at 10. Indeed, Ms. Seltzer acknowledged that no Acme representative would sell a ticket to a customer after ascertaining its post-drawing value, and that she herself had never done so. Further, every other time she had scanned mistake tickets after a drawing, she discarded the losers and kept the winners for Acme to claim. *See* Deposition of Ms. Seltzer, 7/11/19, at 141-42, 149, 152. When Ms. Seltzer in this instance deviated from the Acme procedures that she usually followed, she acted surreptitiously and was not forthcoming about the circumstances of the purchase. *See* Acme's Motion for Summary Judgment,

- 22 -

9/15/19, at ¶¶ 143-154 and Ms. Seltzer's Response, 10/15/19, at ¶¶ 143-154 (admitting Acme's allegations).

Even viewing the evidence in the light most favorable to Ms. Seltzer, no reasonable fact-finder could conclude that Ms. Seltzer acted with the good-faith belief that she was permitted by law or by Acme's policies to give Acme $10 in exchange for $4,150,000.  Hence, the trial court committed no error of law or abuse of discretion in holding that Acme was entitled to judgment as a matter of law.  ***See In re Risperdal Litig.***, ***supra*** at 639.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>12/15/2020</u>